Police, the Court, Ted Frank, on behalf of Appellant Objector Professor Todd Henderson. And we have here a settlement that paid the attorneys nearly seven million dollars and the class less than a million dollars with over 99 percent of the class receiving nothing. And that's the sort of preferential treatment to class counsel that this circuit has consistently rejected in the 2018 amendments. Rule 23E2C forbids in requiring courts to look at the value of the class actually received through the claims process in comparison to what the attorneys receive. Now, counsel, in looking at your brief, I did not see you challenging the notice in this case. Is that correct? We did not challenge the notice under 23C. Class counsel had constitutionally adequate notice. However, they did structure the notice in a way that would throttle the number of claims. And the court should consider that in terms of what the class actually received. Had class counsel wanted the class to receive more money, they could have provided for better notice and a better claims process that would have provided more money to the class. But just in terms of thinking through this case, look, I appreciate where you're coming from. You know, 6.8 million versus one million. That doesn't look good. No doubt about it. But I want to make sure I understand exactly what you think was wrong with that, because if the notice was constitutionally sufficient, arguably they could have received tens of millions of dollars for this Wesson Oil. So what exactly, other than the numbers just being looking bad, and they do look bad, what is, in terms of reversible error, what's the error in that? There's the whole injunctive relief issue, which I have a whole bunch of questions about. But just the 6.8 versus the one million, tell me what is constitutionally wrong with that if the notice was okay? Well, it's not constitutionally wrong, other than a possible 23A4 problem, but it is wrong under 23E and under this court's precedents and under the precedents of other courts for class counsel to structure a settlement so that they receive the lion's share of the benefits. And the parties knew that the class would receive around one million or less than one million because, in fact, class counsel agreed to sort of act as the insurer for ConAgra in case there were excessive claims. And that's at pages, volume two, pages 214 and 215 of the excerpts of record in the settlement. There is a clause in there that if there are too many claims, that comes out of class counsel's pockets rather than ConAgra's pockets. Nobody claims to be unreasonably surprised by the disproportion here. It was structured that way. It was intentionally structured that way. And that's the sort of self-dealing that this court forbids, even before the amendments to 23E2C, which also, we believe, forbid that. And plaintiffs provide no alternative interpretation of 23E2C that would permit this. But what does the new Rule 23E2C require? Does it incorporate Bluetooth? Does it junk the other factors that we had before? What's the new standard now? We think what it means is, and to say this, you have to look at the substantive aspects of the settlement, not just the procedural protections, not just, you know, did they negotiate? We're not alleging. We're just alleging self-dealing here. And the settlement has to be fair to the class. It has to recognize that the attorneys cannot prioritize their own benefit at the expense of the class. And ConAgra is willing to put $8 million on the table. And we're not complaining about that $8 million. We're not saying it needs to be $16 million or $30 million or some other number. But we're saying if it's $8 million, that needs to be split proportionally with, say, $6 million to the class and $2 million to the attorneys. But you can't have that $7 million to $1 million ratio. And this court has said that in cases with much more reasonable ratios. Allen v. Badola was a 3-to-1 ratio. Rose, the class got more than the attorneys did, and the ratio was still inappropriate. So a 7-to-1 ratio is just simply unacceptable. And this court has said that over and over and over again. You can't have that under 23E. That's attorneys working for their own benefit at the expense of the class. How do you respond to the appellee's argument that, you know, the cases you cited are post, excuse me, pre-class certifications and the standard is different if a class has already been satisfied? There's just no appellate basis for that argument. The Ninth Circuit and Bluetooth two specific, addressed two specific concerns. One is you need procedural protections against collusion if the class is pre-certification because the attorneys might be colluding with the defendant in negotiating the settlement. And separately, you need to look at the self-dealing problem. You need to look at disproportionality. You need to look at signs of self-dealing like that benefit the attorneys at the expense of the class. And it did not combine those two. And while the district court here and other district courts have conflated those two and said they need to be considered together, there's no basis for that. Nothing about a clear sailing agreement becomes more appropriate because there's clear sailing, excuse me, because there's class certification. Nothing about class certification protects the attorneys from self-dealing and structuring a settlement where they pay themselves much more than what the class receives. And we know that there's class certification. The court can decertify if class counsel sufficiently breaches its fiduciary duty and the class needs to be decertified under 23A4. Counsel, I appreciate that. And I see what you're saying because you have the same thing. The lawyers have the power, not the class. And that's where problems come up, whether it's pre or post. But there's some language in our case from this year, 2020 Campbell versus Facebook that does seem to suggest that pre-certification is different than post. I was wondering if you could talk about how do we write to get to where you want to go? How do we write around that language in Campbell versus Facebook? And I'm referring to pages 1121 to 1122. I don't think you have to write around it at all. Campbell expressly left that question open and said we're not resolving it. So there would be no inconsistency with Campbell to say that the Bluetooth signs of self-dealing are still a problem even after class certification. And even if you don't want to reach Bluetooth, you still have the 23E2C issues and the disproportionality issues. It's just simply unfair to the class for class counsel to throttle the class claims so that they can receive the majority of the class benefit for themselves. That's still preferential treatment. And it's an objective. You can look at it objectively. We're not asking for some subjective, did they collude? We're not claiming collusion. We're just claiming the evidence is that they self-dealt, that they structured a settlement knowing that they would get much more than their clients would get. And that over 99% of the class would get nothing. And that's absolutely typical in a class action settlement where there is no direct notice to the I think Pearson versus NBTY discusses this problem precisely. And that's 772 at third, at pages 781 through 83. The problem is that if you don't tie the attorney recovery to what the class is actually receiving, they absolutely have the incentive to structure a settlement, to reduce the number of claims made so that the settlement benefit goes to themselves. Because the defendant knows with reasonable actuarial certainty what the number of claims will be and about how much they'll have to pay depending on how the claims process is structured. So they knew in advance that they would end up only having to pay 1 million to the class and 7 million to the attorneys. Now, the defendant doesn't care because they just care about their total liability. But class counsel is supposed to care because they have a fiduciary duty. And the word fiduciary appears nowhere in their briefs. I'd like to reserve the reminder of my Very well. All right. Next up, Professor, you have 13 minutes. Thank you very much, Your Honor. Samuel Zakaroff on behalf of the class claimants here. Every case that Mr. Frank relies on is a case that has a familiar fact pattern. There is a case filed as a class action. There's little work done on it. There's no discovery taken. There is no contested certification. And a deal is structured to receive a percentage of a fund. Typically, that fund is hard to quantify. Typically, that fund includes terms like a vague injunction or includes some kind of cypher recovery. And the inflated, potentially inflated value of the quantum then yields attorneys fees that are larger. This case is not like that. And this case I would submit to the court is very much like Campbell versus Facebook, which was also a case that was mature, that had developed, that had a difficult fact record, that had alterations in conduct by the defendant prior to the final resolution of the case, which had resolved many of the issues presented. And in our brief, we raised three primary points why the Bluetooth line of cases that Mr. Frank is so fond of do not necessarily apply here. And they are in quick order. First, as I just said, this was certified as a litigation class. And not just as a litigation class, this was litigated all the way to the U.S. Supreme Court. This will be the third opinion by this court in this case. In the prior opinion on ascertainability, that was the decisive issue in class action, consumer class action law at the time. That issue went all the way to the U.S. Supreme Court. And the court below, I'm sorry, this court wrote a very detailed, thoughtful opinion, acknowledging the circuit split, acknowledging this was a hard question, and it was fought all the way. Second, the fee recovery here is based on a Lodestar. Now, this court, beginning in the L.A. case in 1988 and continuing through Hyundai on bank just recently, just last year, has presumed the Lodestar to be reasonable. And that presumption has to do with factors like the hours are inflated or the fees, the fee basis is too high. Those issues were not preserved here. There's no question about the Lodestar. And what's more, counsel got 50 percent of their Lodestar, not 100 percent. So the whole Bluetooth scenario, where this is just a windfall, lawyers got in quick, they got out quick, and they made a bundle. These are lawyers who worked for eight years on this case, all the way to the U.S. Supreme Court, against the top Jones Day team from Washington, litigating in the themselves. And the third... If I may interrupt. Yes. It makes sense. Would you say a hard-fought litigation in terms of getting the total size of the fund, that obviously plays a role. But if I can channel my inner Judge Posner, isn't there some economic problems here where, in terms of the allocation between the class and their attorneys, for the defendant, they're happy to pay a little bit less and give more to the attorneys and less to the class. For them, the bottom line is however much they get. So isn't there still a potential with collusion, even if it's a very... There always is. And Judge Posner was the one who educated us on that more than anyone else. But I think that there are two reasons that that doesn't apply here, Your Honor. One, as a matter of fact, and the second as a matter of theory. The first is that in this case, there was a potential $68 million recovery. And Mr. Frank says, oh, that was nonsense because the defendant had actuarial information about how much recovery was going to be had. That's just not true. Ms. Spivey, at the fairness hearing, addressed the court and said, look, we're an old line company. Most people here buy the product because their grandmothers bought it. And we have no information about our client base. We do not have any direct contact. So they had no way of knowing. The second point is, I think, more broad. And that is that when you're dealing with attorney's fees statutes, and this is the third point that I was going to get to, you're dealing with something a little bit different than the market replicating logic of the Seventh Circuit. The Seventh Circuit has been the strongest. This circuit has generally followed that what you're supposed to do with class action is try to replicate what the market would have yielded if you could overcome the transactional barriers of contracting with this broad amorphous group. When you're dealing with a substantive state law dealing that grants fee shifting, this court, the Supreme Court, every court has recognized this is not market replicating. This is market substituting. And the point of this is to incentivize lawyers to take these cases. That's why in our motion for summary affirmance, we relied heavily on city of Riverside versus Rivera and the long line of cases from this court in the Alon case, and from many state courts, which we cite in our brief, which have all followed the idea that you will get this disproportion precisely because these are market substitutionary mechanisms, not market replicating mechanisms. Now, Judge Owens, I agree that we didn't want the class just to recover a million dollars. We hope for much more. It's not in the record, but we prodded the claims administrator, who, by the way, was not of our choosing, was chosen by the magistrate judge. And so this was not a program designed by plaintiff's counsel. This was under the supervision of the court below. We prodded them to try to stimulate the amount of claims made. It's very difficult in a broad amorphous case like this, where amorphous in the sense that the class is millions of people and they're diffused, and they don't go through life saying, I'm a Western oil user. That's not their primary identity. Unlike the VW emissions or the NFL case, where you're dealing with the core of someone's identity. Here, it's very hard to reach them. And why wasn't there a decision? What was the rationale for not trying direct notice? Because you know, these are consumer goods. People now use their discount cards and bonds or rolls and supermarkets have a record of purchases. So you could subpoena bonds or rolls or, you know, their shopper's card and figure out who bought Western oil for the past X number of years. I mean, was there a particular reason why direct notice wasn't selected here? It wasn't selected here because of the small amount of the claim, Your Honor, and because of the cost involved with doing that, with sending notice to everybody who had purchased Western oil. Remember, the class period here goes back to 2006. So we have a huge pool of people who could potentially have made this claim. It could have been done differently. Much more money could have been allocated to that. But I want to insist that this issue was not preserved. The adequacy of the notice was not preserved. Mr. Frank is trying to backdoor it in through 23E, and there's some it's just that the notice was chosen through the court and it yielded this result. But there was no way of knowing ex ante that that was going to be the result. And Mr. Frank, just to put this issue aside, this point about the insurance, it was only for people who filed claims where they produced receipts for their purposes of Western oil. And they would have to produce more than 30 receipts for purchases of Western oil in a six-year class period. So that's an extraordinary, unlikely event. And it shows how hard-fought the negotiations are. Ms. Spivey and I could not agree on the allocation of time, let alone could we agree on how the notice would be structured or anything of that sort. The court had to intercede on those points. And I think that I just want to come back a second, if I may, to the source of law issue, which I think Mr. Frank elides. And that was, again, the reason for our summary affirmance. These are state substantive laws on attorney's fees. This court in the Alaska rent-a-car case and in other cases has said that there must be faithfulness to it. Rule 23E does not override state substantive law. That's just ERIE 101. So what we have here is a state determination to follow the basic logic of City of Riverside v. Rivera, which is these are cases that would not be brought but for the incentive for the attorneys to take them. And they can yield a disproportion. It doesn't look good. Nobody's happy about that. But it looked disproportionate in City of Riverside v. Rivera. It looked disproportionate in Elan. It looked disproportionate in the many cases that we cite in our brief that come from the states, the 11 states in question here. So I think that the issue is, Mr. Frank wants to raise the atmospherics. But coming back to Campbell v. Facebook, the atmospherics do not control in the cases in which you have hard-fought litigation pursuant to the statute where you've had to end up fighting all the way to the Supreme Court. That happens sometimes. Every single one of the cases that Mr. Frank relies on comes back to the question of collusion. He says he's not alleging collusion here. But the very language from Bluetooth was to look for subtle signs that class counsel have allowed pursuit of their self-interest to infect the negotiations. We would have made the same application for attorney's fees, statutory attorney's fees, even if this case hadn't settled. There was an abandonment of the labeling. And I know this seems like a small potatoes type consumer food case. But this issue of GMO is actually an issue of tremendous passion to a small group of people. And to that group of people, it is tremendously important that those who have been with us for eight years continue to monitor this litigation, even though the amounts of money are very small. Mr. Briseno is watching this argument as we speak. And for that group, the relief that was obtained, which was abandoning the label, we never got into the causal relationship because the litigation stopped short of that. But we would have applied under this circuit's catalyst theory for attorney's fees just on that. We started serious settlement negotiations after we beat their cert petition in the Supreme Court. They were sure they were going to win on the ascertainability issue. They were sure the court was going to take it. We defeated certition. Serious settlement negotiations started. So we had a claim to statutory attorney's fees just from the remedies available to the class at that point. Now, Ms. Spivey is going to contest and going to say it had nothing to do with it. And we understand that the company ultimately sold the product while the settlement negotiations were ongoing. But that happens. We were not trying to disrupt efficient corporate reorganizations. It's just a fact that we were concerned about the GMO issue. Now, there is a point that Ms. Spivey made, and I'll just finish with this. There's a point Ms. Spivey made below about 97% of their market by their assessment buys this because their grandmother bought it. And certainly, Wesson has been around for as long as I can remember, and I'm sure a good deal of time longer than that. But 3% were reached through trying to make the product a little bit hipper, a little bit more of the times. And so they slapped the natural label on it. We are not going to prove the causal. And I know Ms. Spivey is going to take issue with me here. But the fact that there was a portion of their market that they were reaching out to expand that 3% when you're dealing with a mass consumer group good like this, that's important. And that's what this lawsuit was about. That label came down. There's an injunction. And final point, if I may, Judge Owens, the injunction, you asked about the injunction at the beginning of I am concerned about I was gonna ask you that. So the injunction was given no value. And as a monetary matter, and it's important to follow what Judge Carney did below because he analyzed under 23 E the adequacy of the settlement for the class, fair, reasonable, and adequate. That's the rule based language. And he did so as part of that, he included the injunction. He said, well, the injunction may be worth something, maybe not, but it's important that they got that injunctive relief and they got some money given how weak the case was. And that's the same as almost identical to the discussion by Judge Friedland in in the Campbell versus Facebook case. Then when it comes to the 23 H component, he says, I don't give the injunction any value here. It's too, it's too diffuse. It's too hard to identify what the economic value of it is. I am following a lodestar analysis. So the fees are not tied in the quantum to the valuation of the injunction. And on that point, Mr. Frank was very successful in riling up some attorneys general, but they're completely off the mark. There's no valuation of that for purposes of the fees. This is not like the Rose case in that sense. It's not like the Dennis case, for example, where it was difficult to value. That was not the basis of the fee award. And so there's a big difference between the 23 E analysis that statins has to be done in a certain way. And the 20 and I agree that the 2018 amendments didn't change the fundamentals of the statin analysis. And then the 23 H component, which is what is the reasonable fee. And for that, the court relies quite and says quite expressly, I rely on the lodestar and I rely on my knowledge of this case. This case has gone on for a long time. There's been a lot of work done. It's been hard fought. It was a difficult case. The council overcame tremendous disabilities, including the rulings of the court that scaled back the quantum of available damages. So I think the injunction is a false issue here, Your Honor. All right. Thank you very much, Professor, for your argument today. Miss Spivey, if you need to go a little bit over to I'll give you a little license there. And Mr. Frank, if you need more than six, I'm gonna give you a little, a little more time. All right, Miss Spivey. Thank you, Your Honor. I'll talk very fast. So first I want to fix an incorrect statement. Class counsel just argued that natural claim was slapped on the label of 3% of consumers to motivate them to purchase the product. There's absolutely no basis for that allegation. And it's contrary to all the evidence that's in the record. The natural claim on Wesson oil predates GMOs. The natural claim was on Wesson oil when ConAgra purchased the brand from Beatrice. And it predates GMOs being approved for use in the United States by the FDA. So there's no allegation or intention that ConAgra somehow slipped natural on the label to appeal to 3% of the population that thought something. There's just no basis for that allegation. It's contrary to the facts. ConAgra takes no position with regard to the fee application reward, but we do take a position with regard to the fairness of the settlement. The class recovery provides maximum relief to the class and is exceedingly fair and generous. And we took plaintiff's price premium. And this has a claims-made program. So it's a claims-made program with no cap to ConAgra. So ConAgra pays all the claims that come in with no cap, up to 30 purchases. There's no proof of purchase requirement. And we took the plaintiff's expert's price premium, what they allege, and assign that as the damage recovery for the class. This is maximum recovery to the class if the class were to prevail on the merits at the district court level. The appellant seeks to strike the entire settlement, but that doesn't benefit the class when the class has already received maximum recovery. There's also no allocational fairness issue here. The appellant is incorrect. ConAgra does very much care about the allocation of the settlement. We did not agree to a $8 million general settlement fund and let, you know, allocate the funds. We painstakingly negotiated every single element of the settlement. In part, we did that to ensure that we weren't incentivizing consumers or the plaintiff's bar from filing more frivolous labeling lawsuits. So we very much have no incentive and have an interest in making sure that the class members pay more than they would ever be able to receive if they prevailed on a great day of trial at the trial court level. And that is what they're if they win. And that's a big if, Your Honor. A lot has changed since the time we entered this settlement and we feel pretty strongly about our chances of defeating this in a motion for summary judgment or de-certifying the class if it were to be remanded. So we do care about the allocation. There was no general settlement fund and class counsel wasn't at liberty to decide what allocation went to who. We very painstakingly negotiated every moment of this settlement. Thank you very much, counsel. Thank you for your argument. Mr. Frank, I'm going to go ahead. Your Honor, if I may, I waive any request for additional time at this point. Fair enough. I'm going to go ahead and give Mr. Frank eight minutes. Thank you, Your Honor. One second. One second. She's got to reset the clock. Absolutely. There you go. You're on. Thank you, Your Honor. With respect to maximum recovery, it's absolutely false that the class received maximum recovery. Maximum recovery is $68 million. The class received $1 million. If they had won judgment for $68 million, there would be $68 million put into funds and they'd find a way. There's a claims process and claims processes like these generally produce less than 1% of the class claiming when there's no direct notice. And we've documented that. The parties knew it when they agreed to no direct notice in a claims process. They knew it'd be around $1 million. They never claimed to have been surprised by how few claimants there were. So, Matt, this is not a $68 million settlement. And the Ninth Circuit has repeatedly said you can't look at the amount made available. You have to look at the actual recovery. And it's not just... Mr. Frank, how much did the, if you know, you probably do know, how much did the average consumer of Wesson Oil get out of this settlement? They got about 1%. The average consumer, if you include the 99% of the class that got nothing, received pennies, basically, because you're talking 20 or 30 million consumers and $1 million in payments. You have to include the 99% of the class that gets nothing. And that's Ninth Circuit law that we've documented. So less than a free bottle of Wesson Oil. That's correct. Now, claimants, the 1% who claims got more, but you have to look at the other 99% as well. Little work. None of the cases we cite are based on the idea, oh, the attorneys didn't work hard enough. None of those cases. And in fact, Eubank v. Pella, 753 F3rd 718 is another case where there is a class certification that was appealed to the Seventh Circuit, was appealed to the Supreme Court. The Supreme Court rejected cert. It was litigated for seven to eight years. And it did not matter when the attorneys were collecting 11 million and the class was going to get less than that. They were going to get about 8.5 million. And that's a much better ratio than we have here. And it did not matter. It was disproportionate. There were other problems as well at the settlement, including the kicker agreement that is also in this settlement. But the fact that it was well litigated, our cases are not about the collusion. It's not about failing to work hard enough. And in fact, the Ninth Circuit has repeatedly said, in cases such as inkjet, you don't get paid for working hard. You get paid for results in class action settlement. And Bluetooth is another case where the fees were based on Lodestar and there was no dispute that the attorneys were getting less than their Lodestar amount. Campbell is a case where there was an injunction and there was a dispute over the injunction, but the class got a, and there's a difference there because it was a B2 settlement over injunctive relief rather than a B3 settlement waiving claims. But the class got injunctive relief. And here we made the argument and the attorney generals made the argument that the injunctive relief was worthless to the class. It's not compensation to the class for their prior claims. And plaintiffs forfeited in their brief. They just said, oh, you can affirm the settlement without looking at the injunctive relief. And now they're trying to backdoor it in after forfeiting it in a brief. And that sandbagging shouldn't be permitted. The state law issue. It's just, we're going to talk ERIE 101. We're talking federal procedure here. Rule 23E is a rule of federal procedure. Is a settlement fair, adequate, and reasonable? That's a question of federal procedure. And state law does not trump that. That's Swift v. Tyson. That's Shady Grove. That's ERIE 101. And Shady Grove, I think, is directly on point because you had a New York statute that said you cannot collect in a class action. And the defendant's insurance company there tried to dismiss the case on the grounds that they were bringing a class action that New York state law did not permit. And it did not matter. Federal procedure controlled, whether it benefits the plaintiffs in that case or benefits the class members in this case. But state law cannot trump the federal procedure of settlement fairness and disproportionality that this court has repeatedly rejected, that Pearson v. NBTY rejects, that Baby Products rejects in the Third Circuit. Another case where the attorneys got less than their load star and it did not matter. So cases like Riverside are irrelevant. They're not 23E cases. They're cases where a prevailing party is litigating their fees against the party that did not prevail. That's not this case. This is a case about settlement fairness. This is not a 23H appeal. This is an appeal under 23E under the fairness of the settlement and the attorneys structuring a settlement so that they are the primary beneficiary of the settlement. It looks bad and it doesn't just look bad. It's illegal under this court's precedents and under the precedents of other circuits like Pearson v. NBTY. And you can read Pearson v. NBTY. There's nothing in there complaining that the attorneys didn't work hard enough. The complaint there is that the attorneys were selfish because they negotiated $2 million for themselves and less than a million dollars for the class. And that ratio is a lot better than the ratio in this settlement. And there, again, it's a low-dollar claim, but they figured out a way to get direct notice to the class. And on remand, the class got millions of dollars more because the Seventh Circuit established a rule the attorneys don't get paid unless the class gets paid. And when you establish those incentives, the attorneys work for those incentives. And that happens in the baby products remand as well. Mr. Frank, can I ask you a quick question, please? Yes. What about... the counsel made the argument well that this isn't just about, you know, a few drops or a few uses of this oil. This case was important and heavily litigated the way it was because of the message that was important and needed to be sent that you don't label products in a false way, such as to draw in health-conscious consumers. And that was... so you don't just look at the dollars that each or lack of dollars or pennies that each consumer received out of this settlement. You look at the overall importance of the settlement to the larger group of consumers, including those that didn't get anything. Your Honor, I have two responses to that. First of all, as we discussed in our opening brief and as the attorneys general discussed, the injunction is worthless. There's no basis to ascribe any value. And they forfeited in their brief any argument against our refutation of that. And they can't switch it around now. And in fact, in their brief, and this is our second argument, they're now trying to have it both ways. Their arguments in their brief was, it's okay for the class to get this little because the claims are weak. That's at page 12 of their brief. And so they want to establish a rule that the attorneys get paid more in a weak case where they can let the class get next to nothing than in a strong case where they have to fairly share the proceeds with their clients. If you want to talk about incentives, that's a very bad incentive. You're incentivizing attorneys to bring weak claims because they'll be more richly compensated than if they bring a strong claim where they can't aggregate all the class settlements themselves. I'm over my time now. I'm happy to answer any other questions this court has. Unless my colleagues have any other questions? Don't think so. Thank you very much, Mr. Frank. Thank you to all. This was an outstanding argument. I tell my law clerks, you know, sometimes the ninth, we don't have the best oral argument, but today we really have had good argument on behalf of everyone. So thank you very much. May I chime in there? Absolutely. Absolutely. Judge Ezra. You know, at my level in the district court, we don't frequently see once in a while, we don't frequently see such polished argument by such a highly competent counsel as we saw today. And I think to all three of you certainly did your clients well today in the professionalism and the preparation and the confidence that you have brought to you. So I would agree with Judge Owens wholeheartedly. Thank you. We really appreciate it. Trust me. So thank you very much. This matter is submitted and we, this particular panel is adjourned and that's whatever word you want to use. Thank you.
judges: Owens, Ezra, Lee